IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION


SUZETTE M. JELINEK,             )
                                )
     Plaintiff,                 )
                                )        CIVIL ACTION NO.
     v.                         )        3:12cv462-MHT
                                )           (WO)
THE UTILITIES BOARD OF          )
TUSKEGEE, a Public Utility      )
organized under the laws        )
of the State of Alabama;        )
WILLIE C. ANDERSON,             )
individually and in his         )
official capacity with the      )
Utilities Board;                )
HAROLD WASHINGTON,              )
individually and in his         )
official capacity with the      )
Utilities Board;                )
LUTALO K. ARYEE,                )
individually and in her         )
official capacity with the      )
Utilities Board;                )
MAE DORIS WILLIAMS,             )
individually and in her         )
official capacity with the      )
Utilities Board;                )
GEORGETTE WHITE-MOON,           )
individually and in her         )
official capacity with the      )
Utilities Board;                )
MARK ENNIS, individually        )
and in his official             )
capacity as General             )

Manager of the Utilities    )
Board of Tuskegee;          )
GERALD LONG, individually   )
and in his official         )
capacity as Chief           )
Financial Officer of the    )
Utilities Board             )
of Tuskegee,                )
                            )
    Defendants.             )


## OPINION

Plaintiff Suzette M. Jelinek, a former employee of the Utilities Board of Tuskegee ("UBT"), claims that she was discriminated against in her employment because of her religion (Catholic), her gender (female), and her race (white); she further claims that she was retaliated against because she complained about the discrimination. She rests her claims on three federal provisions: She rests her religion, gender, race, and retaliation claims on (1) Title VII;[1] and she also premises her race claim on

---

1. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e to 2000e-17.

(2) § 1981[2] and (3) the Equal Protection Clause.[3]   She
names the following as defendants: UBT, its board members,
and various UBT employees.   Jurisdiction is proper under
28 U.S.C. § 1331 (federal question) and § 1343 (civil
rights) and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

     This case is now before the court on the defendants'
motion for summary judgment.   For the reasons that follow,
the motion will be granted.


## I. Summary-Judgment Standard

     "A party may move for summary judgment, identifying
each claim or defense--or the part of each claim or
defense--on which summary judgment is sought.   The court
shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).   The court must view the admissible

---

     2.   The Civil Rights Act of 1866, as amended, 42
U.S.C. § 1981, as enforced through 42 U.S.C. § 1983.

     3.   She relied on this clause as enforced through
§ 1983.

evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. Background

Jelinek, a 49-year-old white woman and a Catholic, began work at UBT in May 2005.[4]  After two years as Human Resources Director, she became the Director of Organizational Development.  This lawsuit arises out of a series of incidents that took place at UBT, eventually culminating in her termination from employment there.  She says that these incidents amounted to discrimination against her because of her race, sex, and religion.

Jelinek's troubles began when UBT General Manager Mark Ennis hired Gerald Long to be the Chief Financial Officer for the organization.  Shortly after he was hired, Long

_____

4.  The parties' filings indicate that, before May 2005, Jelinek worked with UBT as an independent contractor.

4

gave Jelinek "an unsolicited book on Jesus Christ to read" called "Beyond Death's Door."   Compl. (Doc. No. 1) ¶ 13.

Several months later, after an incident in which employees removed from Jelinek's office some muffins that she intended to bring to a meeting later that day, Ennis, Long, and another employee, Alvin Woods, held a three-and-a-half-hour meeting with Jelinek in which they urged her to convert from her Catholic faith and to "seek God." Pl.'s Br. (Doc. No. 37) at 3.

Jelinek contends that, after this meeting, she spoke to Ennis about the way women were treated in the workplace and about the impropriety of "preaching religion in the workplace."  Pl.'s Br. (Doc. No. 37) at 3.  Ennis sent a memorandum to Jelinek stating that she had "orally expressed allegations that [she] ha[d] been subjected to religious harassment and gender discrimination."  Pl.'s Ex. E (Doc. No. 38-5) at 1.  He explained that, given the nature of the allegations, he felt it inappropriate for him to be the person conducting the investigation into

5

them and that he intended to engage a third-party to investigate her claims.

A day later, an incident occurred while Jelinek was working with the On-Site Safety Inspection Team. After the group completed an inspection, the team members went together to lunch. One of the team's members, Melandie Champion, says that, during that lunch, Jelinek told another team member that Champion was being "openly flirtatious" with a man who was there. Pl.'s Ex. F (Doc. No. 39-1) at 1. Champion also says that Jelinek made a rude comment about the orange shirts the team wore for the safety inspection. Several days after this lunch, Champion wrote a complaint about Jelinek's comments to Long. Jelinek responded to Champion's letter by memorandum and stated that both comments were meant to be "innocuous" and "light-hearted." Pl.'s Ex. H (Doc. No. 39-3) at 1.

Jelinek later sent a memorandum to the members of UBT. In it, she explained that she had merely told Ennis that

6

"innocent suggestions, innuendos, [and] joking criticisms could be misinterpreted by employees and third parties" who might overhear them."  Pl.'s Ex. I (Doc. No. 39-4) at 1.  She reported that she was "stunned" to receive Ennis's memorandum contending that she had made allegations of religious and sexual harassment and that she was confident "the Board will conclude that there is actually nothing to be done."  Id.

UBT Board Chair Willie Anderson sent Jelinek a letter stating that a law firm was being hired to investigate "(i[]) [Jelinek's] allegations regarding ...  religious harassment and gender discrimination ... and (ii[]) the complaint that was presented by ... Champion regarding certain conduct that [Jelinek] displayed which she alleged was offensive, harassing, and intimidating."  Pl.'s Ex. J (Doc. No. 39-5) at 1.

In a written opinion, the law firm concluded that, while Jelinek "maintains that she is not making a claim of religious discrimination against Mr. Ennis or any other

7

person, it could be seen as inappropriate and borderline unlawful for management employees of UBT to impose religious beliefs on another employee." Pl.'s Ex. D (Doc. No. 38-4) at 4.   The firm also concluded that Jelinek's behavior toward Champion, even if true, would not amount to any sort of legal violation and that it was within UBT's discretion to decide whether Jelinek had violated any internal policies.

While the investigation by the law firm was ongoing, Ennis distributed a "Corporate Culture Survey" at a staff meeting, which would be evaluated by an outside company. Sixty-six employees completed the survey form.   The court has been provided with summaries of the survey results created by the outside company, but not with the surveys themselves.   Among the "sample responses" provided about the leadership in Human Resources, which presumably were aimed at Jelinek, were "lies and will tell you she is superior to all," "treats employees disdainfully," and

8

"lies about employees and stirs up discord."  Defs.' Ex.
E (Doc. No. 29-5) at 19.

A second survey was distributed several weeks later.
This time, only members of the UBT leadership completed
the survey.  The survey results (again, produced for the
court in the form of only a summary created by the outside
company) suggest a consistent view among management that
Jelinek had poor interpersonal skills.  The comments also
stated that Jelinek "Fabricates and exaggerates stories"
and "Needs to work on ... being honest."  Defs.' Ex. F
(Doc. No. 29-6) at 12.  Jelinek points out that all of the
individuals who completed this survey were men, that only
three of them were white, and that three of the
participants were Ennis, Long, and Woods, who had urged
her to convert from Catholicism.

Next, Ennis performed a job analysis on Jelinek.  On
the basis of the survey results, he ranked her performance
as "marginal" in the area of "employee relations."

9

However, the rest of her ratings were more or less positive.

As the holidays approached, Jelinek received another religious book titled "The Purpose of Christmas."  This time, it was Ennis who gave her the book.  Jelinek says that Ennis distributed four or five copies of this book at the office.

Some time after this, Ennis met with Jelinek and informed her that he had determined that they should "come to a mutual[ly] agreeable separation."  Pls.' Ex. A, Jelinek Dep. (Doc. No. 38-1) at 20.  When Long learned that Ennis planned to do this, he had Jelinek's administrative rights to her computer removed.  Three days later, Jelinek told Ennis that she was not going to resign.  In a letter, Jelinek wrote that she denied any allegations that had been made against her and stated that, due to "multiple incidents involving harassment, intimidation, and false accusations," she would not

comment further without an attorney present.  Pl.'s Ex. M
(Doc. No. 39-8) at 1.

In this same time period, complaints about Jelinek
surfaced from two other UBT employees: Kenneth Sinclair
and his mother.  Sinclair's mother alleged that Jelinek
had told her that Sinclair was not a good employee.
Jelinek had also reportedly commented to another employee,
Brandi Tate, that Sinclair was a "ladies man," that "all
of the females love him," and that he "wanted her."
Defs.' Br. (Doc. No. 28) at 8.  Jelinek, meanwhile,
alleges that Ennis and Long asked Sinclair, his mother,
and Tate to write memoranda concerning comments she had
allegedly made only after she refused to resign, the
implication being that they were seeking to amass evidence
against her.

On September 16, 2010, Jelinek completed an intake
questionnaire with the Equal Employment Opportunity
Commission ("EEOC").  Her  attorney subsequently sent a
letter to UBT informing it that Jelinek had initiated a

process with the EEOC and intended to pursue charges to completion.  On November 19, Jelinek completed a charge of discrimination with the EEOC in which she alleged that UBT discriminated against her because of "[her] race, White, sex, female, religion, Catholic, education level and doctorate, and retaliated against her because [she would] not resign [her position], and because of [her] disability."  Pl.'s Ex. O (Doc. No. 39-10) at 2.  Jelinek contended that Long "used religion to berate [her] and intimidate [her], and as a basis for questioning [her] value as an employee and [her] judgment as the Organizational Development Director."  Id. at 1.  She also alleged that "Mr. Ennis recommended that [she] resign from [her] position because of [her] disability."  Id. Jelinek further stated that, in one incident,  Sinclair "came up behind [her] and aggressively slapped/grabbed [her] butt cheek."  Id.  She alleged that she never reported the incident because she feared reprisal from Ennis.

Jelinek's attorney forwarded this charge to counsel for UBT.

In response to Jelinek's allegations, UBT retained Delores Boyd, a former United States Magistrate Judge, to investigate her complaints as well as the complaints about the incidents involving Sinclair. In her investigative and definitely well you as a gas in an you in an is a report, Boyd concluded that Jelinek had indeed commented on Sinclair's reputation with women and made remarks to Sinclair's mother disparaging Sinclair's work ethic. Boyd found that Jelinek's comments arose from "bad judgment rather than bad motivation," but that "they ... reflect a consistently demonstrated workplace reputation" for poor interpersonal skills. Defs.' Ex. C (Doc. No. 29-3) at 23. She explained that "Witnesses interviewed ... provided highly probative accounts of [Jelinek's] workplace character and reputation ... which have reportedly left the majority of employees at UBT with no, or severely diminished, trust and confidence in her integrity." Id.

13

at 35.  As a result, Boyd found that disciplinary action against Jelinek was warranted.  Boyd further concluded that the allegations that Jelinek made of sexual harassment were not credible.[5]  Boyd did, however, find that the lock down of Jelinek's computer was inappropriate.

In this same time period, Jelinek was involved in two additional incidents with other UBT employees.  In one incident, a fire alarm went off at the office.  While the alarm was still sounding, Jelinek heard Ennis call Long and another employee, James Samuel, back into the building.  Jelinek, who alleges that she was "Safety Director," wrote a "formal written warning" to Ennis, Long, and Samuel.  Pl.'s Br. (Doc. No. 37) at 9.  The defendants deny that Jelinek had any authority to issue these warnings.  In a separate incident, an employee, Marc Cooley, was directed to Jelinek's office to ask about a

_____

5.  Jelinek told Boyd not to include her allegations against Long and Ennis in the investigation, and so Boyd did not draw any conclusions about these complaints.

14

problem with his pay.  Jelinek asked Cooley whether he had received his annual evaluation.  When he said that he had not, she commented that Ennis never gives evaluations and then made suggestions for how Cooley might resolve his issue.

On December 2, 2010, Jelinek received a letter from Ennis that she was being suspended from work without pay. In the letter, Jelinek was provided a number of reasons for her suspension, including the following: (1) The "Written Formal Warnings of Disciplinary Action" that Jelinek issued against Long, Samuel, and Ennis for re-entering the building during a fire alarm.  The letter states that Jelinek had no authority to issue these warnings and violated a number of internal policies.  (2) "[D]isparaging statements" about Ennis made to Cooley. Defs.' Ex. H (Doc. No. 30-2) at 2-3.  Jelinek's attorney quickly responded to this notice, stating that the suspension was "considered retaliation for the EEOC complaint."  Pl.'s Ex. W (Doc. No. 42-1) at 1.

On December 30, Ennis wrote Jelinek a letter that informed her that he was recommending that she be terminated.  In the letter, Ennis provided the following reasons for her termination: (1) unacceptable job performance (particularly poor interpersonal conduct); (2) Jelinek's remarks about Sinclair; (3) insubordination related to the written warnings Jelinek issued about the fire alarm incident and her comments to Cooley; and (4) "Threatening Behavior," which was also based on the warnings she had issued, her comments to Cooley, and Jelinek's secret recording of a strategic team meeting. Pl.'s Ex. X (Doc. No. 42-2).  Ennis stated that these incidents "separately or collectively constitute very serious, unacceptable major breaches of the professional standards of conduct established for employees of UBT and warrant dismissal."  <u>Id</u>. at 3.

After a hearing, the UBT Board adopted Ennis's recommendation to terminate Jelinek.  Jelinek then filed this federal lawsuit.  Her complaint was muddled and the

court struggled to understand her claims.  However, at the pretrial conference, she clarified her claims, which consist of the following: (1) hostile-work environment on the basis of religion in violation of Title VII, gender in violation of Title VII, and race in violation of Title VII and § 1981; (2) discriminatory removal of duties based on gender and race in violation of the Equal Protection Clause; (3) discriminatory suspension based on her gender and race in violation of the Equal Protection Clause; (4) discriminatory termination based on gender and race in violation of the Equal Protection Clause; and (5) suspension and termination in retaliation for filing an EEOC charge in violation of Title VII.[6]

---

6.    Additionally, in her complaint, Jelinek alleged violations of the Due Process Clause, but, during the pretrial conference, she agreed that these claims had been abandoned.  Jelinek also asserted a number of state-law claims in her complaint, which she later abandoned too.

### III. Discussion

### A.   Hostile-Work Environment

Jelinek claim that she was subjected to a hostile-work environment based on her religion, gender, and race. The court addresses each basis for this claim in turn.

### 1. Religion

A plaintiff alleging discrimination under Title VII based on religious harassment may establish such by showing the following: "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment was based on [her] religion; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." Lara v. Raytheon Tech. Serv. Co., LLC, 476 Fed. Appx. 218, 220-21 (11th Cir. 2012).

Here, this claim may be resolved by addressing the severity prong.  In order to be sufficiently severe, the

18

harassment alleged must be "both objectively and subjectively offensive," such that it was both felt to be offensive by its victim and would be perceived as such by a reasonable person. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Factors that a court considers in determining whether the harassment was objectively severe include: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Ralston v. Bell Aerospace Servs., Inc., No. 1:09CV379-MHT, 2010 WL 2403084, at *4 (M.D. Ala. June 14, 2010) (Thompson, J.).

In her brief, Jelinek describes the following incidents as examples of religious-based harassment giving rise to her hostile-work environment claim: (1) Long's giving her a religious book entitled "At Death's Door," which she contends was unsolicited; (2) the meeting with Ennis, Long, and Woods, in which Jelinek was told that she

19

needed to "seek God"; and (3) Ennis's giving her a religious book called "The Purpose of Christmas" and handing out a few additional copies of this book at the office. Jelinek alleges a number of additional incidents in her complaint that are not addressed in any depth (or mentioned at all) in her brief in opposition to summary judgment. Most of these allegations, in addition to a number of others drawn from her deposition, are summarized in the defendants' brief, and Jelinek refers to this summary without providing any detail about these incidents herself.[7]

---

    7. The incidents summarized by the defendants in their brief are as follows: "(1) Kathryn Sinclair, receptionist, told Plaintiff she should have taken her husband's last name because the Bible states you should; (2) Mrs. Sinclair's placement of a flower case on her desk with the inscription 'I can do all things through Christ who strengthens me'; (3) statements by Mark Ennis, Gerald Long, and Mrs. Sinclair that she should 'seek Christ[,]' following an employee dispute; (4) Mark Ennis and Gerald Long made a statement to her that she did not need a priest between her and her relationship with God; (5) at a UBT holiday party, Mark Ennis stated before everyone that he accepted Jesus Christ as his Savior; (6) Mark Ennis stated that it was time for her husband to seek the Lord after his mother had died; (7) at a dinner
(continued...)

Neither the allegations detailed by Jelinek in her brief or at the pretrial conference nor those merely listed in her complaint or in the list drawn from her deposition that is compiled in the defendants' brief amount to harassment sufficient to create a hostile-work environment.  In <u>Alansari v. Tropic Star Seafood Inc.</u>, 388 Fed. Appx. 902 (11th Cir. 2010), the Eleventh Circuit Court of Appeals considered a hostile-work-environment claim that was, like Jelinek's, grounded in pressure to change the employee's religion and a work environment that was generally permeated with Christianity.  The plaintiff in that case, a Muslim, alleged that he was "solicit[ed] to go to church because 'Jesus would save' him," and subjected to "other comments about his Muslim religion, and the playing of Christian music on the radio."

_____

(...continued)
at Bonefish Grill outside of work hours, the conversation of the employees involved religion, and Mark Ennis encouraged Plaintiff and her husband to join his church; (8) several employees prayed to Jesus Christ at work; and (9) Mark Ennis and Gerald Long both gave her religious books."  Def. Br. (Doc. No. 28) at 21-22.

Alansari, 388 Fed. Appx. at 905. The court concluded that, while these incidents "may have been unwanted and even derogatory, ... [they] did not rise to [the] threatening or humiliating level" that can form the basis of a hostile-work-environment claim. Id. In other cases in which the plaintiff has alleged a religious hostile-work environment, the Eleventh Circuit has similarly concluded that the mere incidence of unwelcome comments was insufficient to form a prima facie case. See, e.g., Lara, 476 F. App'x at 221 (finding that, while the plaintiff did suffer "unwarranted and derogatory comments about religion, there was nothing threatening or humiliating about the content of those offensive statements; they [we]re more analogous to 'mere offensive utterance[s]' that, although not suitable for work, do not rise to the level of Title VII harassment") (quoting Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002)); MackMuhammad v. Cagle's Inc., 379 F. App'x 801, 805 (11th Cir. 2010) (finding that, even though

22

references to the plaintiff, who was a Muslim, in the
workplace as "Bin Laden" and "Muhammad-man" and jokes
about his religion were "rude, insulting, and
insensitive," the comments "f[e]ll more in the category of
epithets or boorish behavior, which are not actionable
under Title VII"); Richardson v. Doughterty Cnty., Ga.,
185 F. App'x 785, 791 (11th Cir. 2006) (finding that the
"allegations [did] not rise to the level of severe and
pervasive harassment" where the plaintiff's supervisor
"referred to him as 'preacher man' more than fifty times
and other employees made comments regarding his religion
and request for accommodation"). As in those cases, the
conduct of which Jelinek complains is no doubt obnoxious;
the court can easily understand why unsolicited comments
about religion and an atmosphere permeated with openly
shared religious beliefs that differed from Jelinek's own
would cause her discomfort. However, as in the cases
cited, these incidents simply do not rise to the level of
severity contemplated by Title VII. Jelinek's evidence

falls far short of the line that this circuit has established between behavior that is merely noxious and the severe conduct that creates a hostile-work environment.

Accordingly, because Jelinek has not shown that any religious harassment she suffered was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," she has not established a case of a hostile-work environment based on religious discrimination. <u>Lara</u>, 476 F. App'x at 220-21.

### 2. Gender

Jelinek's hostile-work-environment claim based on gender may be addressed under the same legal framework described above for religious discrimination.[8]  It is

---

8. As with a claim of religious hostile-work environment, a plaintiff may prove such a gender claim by showing: "(1) she belongs to a protected group, (2) she has been subject to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4)
(continued...)

evident that Jelinek cannot establish a hostile-work environment. She provides no evidence of harassment based on her gender in her brief, as far as the court could tell. Instead, the only allegations the court could pinpoint that could be construed as gender harassment are found in her complaint and in the defendants' brief, summarizing from her deposition. In the complaint, Jelinek alleges that Ennis wished to keep female employees from having offices on the top floor because "[women] were nothing but trouble and caused cat fights." Compl. (Doc. No. 1) at 4. She further alleges that, at one point, Ennis commented, "[This] line of work is cut out for men, unless they are women with some serious testosterone ... if you know what I mean[.]" Id. at 5. Finally, Jelinek alleges that, after she was invited to speak at the

---

(...continued)
the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment, and (5) the employer is responsible for such environment." Smith v. Naples Community Hosp., Inc., 433 F. App'x 797, 799 (11th Cir. 2011).

Tuskegee Optimist Club, Ennis advised her to get a male employee to do it instead, and said, "They are a bunch of old men and would like to hear what a man has to say." Id. at 6-7.[9]

Jelinek does not provide any evidence about these incidents in her brief; indeed, she does not even mention them. However, even if she had provided more evidence or detail, these comments, while boorish and inappropriate, fall short of the severity required to establish a hostile-work environment. Therefore, summary judgment is due on this claim.


### 3. Race

Jelinek brings her hostile-work environment claim based on race under § 1981 and the Equal Protection Clause, in addition to Title VII. Again, the court uses

---

9. The defendants' brief addresses two additional incidents alleged in Jelinek's deposition: a comment by Ennis that Jelinek should be a "mama bear" and a statement by Long that "women are difficult to work with." Defs.' Br. (Doc. No. 28) at 28.

the same legal framework outlined above for Title VII
hostile-work-environment claims, and the court's analysis
under § 1981 and the Equal Protection Clause "mirrors that
under Title VII." Brown v. Ala. Dept. of Transp., 597
F.3d 1160, 1174 n.6 (11th Cir. 2010). Therefore, the
court applies the same analytical framework to Jelinek's
race-discrimination claim that it employed for her claims
of religious and gender discrimination.

Jelinek provides no evidence and no allegations in her
complaint that suggests even a whiff of a hostile-work
environment based on her white race. Nor does she make a
single allegation in her complaint related to harassment
based on her white race. The defendants' brief provides
an account of her deposition testimony on this issue,
wherein she stated that "(1) she was told by several Board
members that it was 'her or Mark Ennis'; (2) she was told
by Mark Ennis that the chairman of the Board disliked her;
(3) she was told by Mark Ennis that the chairman and other
members 'wanted the whites to go'; (4) Gerald Long told

her that interracial couples were frowned upon when he grew up; and (5) Mr. Long avoided working with her." Defs.' Br. (Doc. No. 28) at 26.  None of these allegations even approaches the sort of race-based harassment that constitutes a hostile work environment.

At the pre-trial conference, Jelinek offered as examples of race-based harassment that she was accused of saying something about a black employee that she did not say and that she was, in essence, held to a higher standard than black employees.  She also, once again, alleged that the investigations that took place were examples of harassment.  Finally, she alleged that the incident in which her computer was turned off was race-based harassment because the person who ordered it turned off was a black male and of Middle-Eastern descent.  This account does nothing to alter the court's conclusion. Thus, summary judgment is due on this claim as well.

## B. Removal of Duties

In the pretrial conference in this litigation, Jelinek stated that she wished to assert a claim of discriminatory removal of duties, alleging that she was stripped of her position as Safety Director after she wrote warnings to Ennis, Long, and Samuel for reentering the office building while a fire alarm was sounding.  At the pretrial conference, she clarified that she is alleging this was done because of her race and gender.  Although this claim was not clearly stated in the complaint, the court will nevertheless address it here.

Jelinek asserts this claim under the Equal Protection Clause as enforced through § 1983.  When § 1983 "is used as a parallel remedy for violation of Title VII, the elements of the two causes of action are the same," and the court may "discuss these claims under the same framework."  Underwood v. Perry County Com'n, 431 F.3d 788, 793 (11th Cir. 2005) (quotations and citations omitted).

29

"Whether an employer intentionally discriminated against an employee ... may be proved either through direct or circumstantial evidence." E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002). Absent any direct evidence of an employer's discriminatory motive, a plaintiff may establish her case using the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See id. One way to establish a prima-facie case that an adverse-employment action was based on impermissible discrimination through circumstantial evidence is to show that: (1) the plaintiff was a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse-employment action; and (4) she was replaced by someone outside of her protected class or was treated less favorably than a similarly situated individual outside of her protected class. See Jones v. United States Alliance, L.L.C., 170 F. App'x 52, 56 (11th Cir. 2006) (citations omitted).

30

Here, Jelinek has failed to establish a prima-facie
case.  First and foremost, the evidence does not establish
that Jelinek actually ever held the title of Safety
Director and that this title was then stripped from her.
But, more importantly, she does not identify any similarly
situated person who was treated differently from the way
she was; instead, she vaguely refers to the existence of
individuals who were not white and female who received
different treatment.  Therefore, summary judgment will be
granted on this claim.


## C. Suspension and Termination

Jelinek's next claim is that her suspension and
termination were based on discrimination because of her
gender and race.   While Jelinek's suspension and
termination were separate adverse actions, because the two
were based on the same allegations about her and because
she does not provide separate argument as to each of these
actions in her brief, this court will address them

together.   Again, Jelinek asserts these claims under the
Equal Protection Clause.   The court applies the legal
framework for adverse-employment actions outlined in the
previous section.

First, the court addresses Jelinek's claim of
discriminatory suspension and termination based on gender.
She does not provide any direct evidence linking her
termination to her gender.   She also fails to establish
her claim through circumstantial evidence under the
McDonnell Douglas framework because she fails to show that
she was replaced by someone outside of her protected class
or was treated less favorably than a similarly situated
individual outside of her protected class.  See Jones, 170
F. App'x at 56.   Jelinek attempts to show that others
outside of her protected class were treated more favorably
by providing a number of examples of individuals who she
says violated UBT policies, but were treated differently
from the way she was.[10]   However, none of her examples

_____

10. Jelinek alleges that the following circumstances
(continued...)

32

constitutes a valid comparator.  "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether ... employees ... involved in or accused of the same or similar conduct ... [were] disciplined in different ways."  <u>Holified v. Reno</u>, 11 F.3d 1555, 1562 (11th Cir. 1997).  However, the Eleventh Circuit "'require[s] that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from ... confusing apples with oranges.'"  <u>Hawkins v. Potter</u>, 316 F. App'x 957, 960-61 (11th Cir. 2009) (quoting <u>Maniccia v. Brown</u>, 171 F. 3d 1364, 1368 (11th Cir. 1999)).  Here, other than the bare fact that the

---

(...continued)

demonstrate that similarly situated black men received better treatment: (1) Sinclair, a black male, had no action taken against him for not having a valid Alabama driver's license, even though the license is required by UBT policy; (2) Long, a black male, cut off Jelinek's access to the computer system and was not punished, even though this was done in error; and (3) Chris Thompson, a black male, sent a message to a co-worker that said, "I want to f--- you," and was reprimanded and transferred, but not terminated.

comparators Jelinek identifies allegedly violated UBT policies, the conduct she attributes to them is wholly inequivalent to the violations of policy attributed to Jelinek.  Moreover, she attributes only one incident to each of the alleged comparators.  In his letter informing Jelinek that he recommended her termination, Ennis provided four separate reasons for his recommendation, including both discrete violations of UBT policy and a generally unacceptable job performance arising from poor interpersonal skills.  In the suspension letter, Ennis identifies two separate reasons for suspension.  Thus, because she has failed to create an issue of fact for the jury through either direct or circumstantial evidence, Jelinek fails to establish a prima-face case of discriminatory suspension and termination based on gender.

Jelinek is similarly unsuccessful in establishing discriminatory suspension and termination claims based on race.  Again, she provides no direct evidence that she was suspended or terminated because she is white.  She also

failed to make her case through circumstantial evidence; for the same reasons the court described with regard to gender discrimination, Jelinek has not presented any valid comparators and has not shown that she was replaced by someone who was not white.

## D. Retaliation

In addition to her claims above, Jelinek asserts that she was suspended and terminated in retaliation for bringing her EEOC charge.  A prima-facie case of retaliation may be established by showing that: (1)  the plaintiff engaged in a protected activity; (2) she suffered an adverse-employment action; and (3) there was a causal connection between the protected activity and the adverse-employment action.  See Freeman v. City of Riverdale, 330 F. App'x 863, 867 (11th Cir. 2009) (citing Maynard v. Bd. of Regents of Div. Univ. of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003).

The defendants do not contest that the first two elements of the prima-facie case are met. Therefore, the court focuses on the third prong: causation. To establish the causal connection element of the prima-facie case, "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (quotations and citations omitted). In order to make this showing, "a plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000). "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Id.

Here, Jelinek succeeds in establishing a prima-facie case by showing that an adverse-employment action followed

36

closely on the heels of her filing an EEOC charge and
making UBT aware that she was doing so.  She details the
timeline of events that culminated in her termination as
follows: On October 6, 2010, Jelinek's attorney informed
the UBT Board that she was in the process of filing EEOC
charges; on November 29, her attorney forwarded to the UBT
Board a copy of the charge that she had filed with EEOC;
on December 2, Ennis suspended Jelinek; on December 30,
Ennis wrote a letter recommending Jelinek's termination;
and finally, on March 15, 2011, Jelinek was terminated.
UBT's actions occurred in close enough proximity to
Jelinek's EEOC charge to constitute circumstantial evidence
of retaliation.

Once the plaintiff establishes a prima-facie case, the
burden shifts to the employer to articulate a legitimate,
non-retaliatory reason for the challenged employment
action.  Goldsmith v. Bagby Elevator Co., Inc., 513 F. 3d
1261, 1277 (11th Cir. 2008).  As described above, UBT
provided a number of reasons for Jelinek's termination,

37

included unsatisfactory job performance based on her allegedly poor interpersonal skills and a series of violations of UBT policy.  Thus, the court finds that the defendants have met their burden of articulating non-retaliatory reasons for terminating Jelinek.

To satisfy her "ultimate burden of proving retaliation by a preponderence of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct," Goldsmith, 513 F.3d at 1277, Jelinek further emphasizes temporal proximity, arguing that there is "no ... tangible evidence that indicates Defendant Ennis was going to take any type of disciplinary action against Dr. Jelinek prior to ... being provided with a copy of ... [her] EEOC complaint."  Pl.'s Br. (Doc. No. 37) at 23. However, the Eleventh Circuit has consistently found that temporal proximity, standing alone, is insufficient to show that an employer's reasons were pretextual.  See Wascura v. City of S. Miami, 257 F.3d 1238, 1245 (11th Cir. 2001) (collecting cases).

Jelinek's only other evidence of pretext is her assertion that she was retaliated against once before, when her computer was shut off after her meeting with Ennis in which he recommended that they agree to separate. Jelinek's argument appears to be that this earlier incident with the computer evidences UBT's propensity for retaliation. The court is unable to conclude that this incident provides sufficient evidence that UBT's reasons for suspending and terminating Jelinek were pretextual. Jelinek never alleges that her computer was locked down in retaliation for making complaints about religious-, sex-, or race-based discrimination. The incident occurred shortly after Ennis had attempted to persuade her to come to a mutually agreeable separation with UBT, and Jelinek argued that her computer was locked in order to coerce her to resign. While this incident may evidence that UBT has a propensity to act inappropriately or unprofessionally, it does not, standing alone, suggest that UBT tends to retaliate against employees who complain about

39

discrimination.  Thus, this incident is simply too thin a reed on which to rest Jelinek's claim that UBT's reasons for firing her were pretextual.

***

Accordingly, the defendants' motion for summary judgment will be is granted.  An appropriate judgment will be entered.

DONE, this the 23rd day of October, 2013.


            <u>  /s/ Myron H. Thompson  </u>
            **UNITED STATES DISTRICT JUDGE**